# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| FORREST PACE, On Behalf of Himself And All Others Similarly Situated, | ) ) ) | Civil Action No. _____ |
| Plaintiff, | ) ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| NAVISTAR, INC. | ) ) | |
| and | ) ) | |
| FORD MOTOR COMPANY | ) ) | |
| Defendants. | ) ) ) | |

## NATURE OF THE ACTION

1. Plaintiff Forrest Pace brings this action on behalf of himself and all other similarly situated owners and lessees within North Carolina of Defendant Ford Motor Company ("Ford") branded trucks and vehicles equipped with Ford's 6.0 L diesel engine, commonly known as Ford's Power Stroke® Diesel Engine. The Ford 6.0 L diesel engine was manufactured by co-defendant Navistar, Inc. (formerly known as International Truck and Engine Corporation) ("Navistar"). It powers the diesel version of Ford's Super Duty trucks and Ford Excursion vehicles for model years 2003-2007. This Navistar-designed and manufactured engine powering Ford vehicles has been plagued by serious and pervasive design and manufacturing defects that render the engines and vehicles unmerchantable and unsuitable for use. So prevalent are the problems plaguing the engine, that Ford has seen fit to sue Navistar in Michigan state court, alleging that Navistar has failed to shoulder its responsibility for paying its share of the warranty

1

costs that Ford has had to outlay in connection with warranty claims filed by owners and lessees of Ford vehicles equipped with the 6.0 L diesel engine.  Yet, while Ford was internally and in its lawsuit against Navistar representing and documenting at length the pervasive design, manufacturing, and reliability defects of an unprecedented nature that plagued the 6.0L diesel engine, it was at the same time concealing this knowledge from unsuspecting consumers like Plaintiff and the members of the putative class.  Not only that, but at the same time that it was internally cataloguing the systemic quality failures and defects in the 6.0 L diesel engine, Ford publicly was disseminating to consumers advertisements that touted and boasted about the superior qualities of the very engine that Ford had privately repudiated as being plagued by "unprecedented problems."   This action seeks relief on behalf of Plaintiff and the members of the putative class from Defendants Ford and Navistar based on claims brought for violations of the North Carolina Unfair and Deceptive Trade Practices Act, breach of an express warranty, breach of contract duties owed to third-party beneficiaries, negligence, and unjust enrichment. This Class Action Complaint does not seek relief for, and explicitly excludes, any claims for personal injury.

## JURISDICTION AND VENUE

2.   This Court has subject matter over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) (as amended 2005) because the Complaint pleads a class action involving an amount in controversy of more than $5 million, excluding interests and costs, and also involves a putative plaintiff class of diverse citizenship than Defendants.

3.   This Court has personal jurisdiction over Ford Motor Company ("Ford") because Ford transacts business within this judicial district, selling million of vehicles in this judicial district through its authorized dealers.  This Court has personal jurisdiction Navistar because it

transacts business within this judicial district, injects its vehicles and engines into the stream of commerce within this judicial district, maintains within this judicial district several authorized dealers for sales and repair of its trucks and engines, and ships or otherwise supplies replacement parts for its engines to dealers and customers within this judicial district. Both defendants have registered agents within the State of North Carolina that are authorized to accept service of process for lawsuits filed against these entities within the State of North Carolina.

4. Venue is proper in this district because Plaintiff resides within this judicial district, and Plaintiff's Ford vehicle with the allegedly defective Navistar 6.0 L diesel engine that forms the subject of this lawsuit is located within this judicial district. The allegedly false advertisements made by Ford also were disseminated within this judicial district. Venue in this district is therefore proper pursuant to 28 U.S.C. § 1391.

## THE PARTIES AND THEIR EXPERIENCES

5. Plaintiff Forrest Pace is a resident of North Carolina. He is the second owner of a 2005 Ford F-350 truck equipped with Ford's 6.0 L Diesel Engine that was designed and manufactured by Navistar. The vehicle has experienced significant, persistent, and costly breakdowns for which Mr. Pace has had to outlay thousands of dollars in repairs. After accruing merely 119,000 miles, which is just a fraction of the expected reasonable lifetime for a diesel engine, Mr. Pace's truck has already experienced a defective EGR cooler that required replacement, as well as blown head gaskets, which also required major engine disassembly and replacement. Aside from the repair and replacement costs, of course, Mr. Pace has incurred or paid for costs associated with the loss of use of the vehicle while it was disabled or being repaired, and the diminution in value of a vehicle plagued by these problems. Because Ford purports to unilaterally impose a 5 year/100,000 mile durational period on the limited warranty

3

applicable to Plaintiff's truck, it refused to cover any of the costs of repair and/or replacement needed by Plaintiff, even though Ford knew at the time the truck was first sold and the truck was within the durational warranty that the engine powering the truck was defective.

6. Defendant Ford Motor Company is a Delaware Corporation, having its principal place of business at One American Road in Dearborn, Michigan. Ford is one of the world's largest automobile manufacturers, boasting annual revenues in the billions of dollars. Ford's F-Super Duty truck line has been one of Ford's best-selling vehicle lines over the years, and Ford has boasted about and touted the supposedly first rate quality, superiority, and toughness of these vehicles in its widespread advertisements across various media. Yet, as detailed more fully below, while Ford publicly was making such representations to consumers, Ford internally recognized that the Ford 6.0 L diesel engine powering its F-Super Duty diesel trucks was plagued by significant quality, design, manufacture, and reliability issues. So serious were Ford's concerns over the quality, design, and manufacture of the 6.0 L diesel engine, that on or about January 11, 2007, Ford filed suit in Michigan state court against Navistar International Transportation Corporation and International Truck and Engine Corporation (the former name of Navistar, Inc.), the manufacturers of the 6.0 L Diesel engine powering Ford's F Super Duty diesel trucks. Ford's lawsuit complained, *inter alia*, that Navistar was not living up to its obligation to contribute its share of the significant number of warranty costs that Ford was incurring in having to repair, replace, or repurchase significant numbers of Ford trucks equipped with the diesel engine. The contractual relationship between Ford and Navistar is detailed more fully below, but for now, it is noteworthy to point out that in its lawsuit against Navistar, Ford represented through sworn affidavits and in legal memoranda filed before the Michigan state court, *inter alia*, that:

4

a. "the 6.0 L engine has experienced quality problems from the time of its November 2002 launch. It has the highest repair rates of any engine Ford has put into widespread distribution. As a result, warranty, ONP ["Owner Notification Programs"], and RAV ["Reacquiring A Vehicle"] spending have been enormous, and Ford ultimately was forced to dedicate a team of 70 engineers to assist Navistar on ways to fix the 6.0 L engines already on the road and to improve the quality of the 6.0 L engines still to be produced."

b. "Ford has still incurred an $887 million warranty bill for 6.0 L repairs"

c. "ONP and RAV costs have also been substantial. Ford has spent more than $88 million in ONP directly related to the 6.0 L engine, and $84 million on vehicle buy backs due to problems with Navistar's 6.0 L engine."

d. "Navistar's 6.0 L Engine Experienced Immediate, Unprecedented Problems."

e. "Ford has spent $227 million addressing injector problems in the 6.0L"

f. "Navistar used a new, non-industry standard fuel injector system for the 6.0L, which has resulted in a large number of warranty claims."

g. "86% of the injectors [in the 6.0 L diesel engine] replaced by dealers were confirmed to be problematic"

h. "Navistar also used a new turbocharger on the 6.0L that is more complex than the turbochargers that Navistar had previously used in engines supplied to Ford. Ford has received numerous warranty claims related to the turbocharger."

i. Ford has spent $182 million in warranty expenses for required turbocharger replacements in Ford vehicles equipped with the 6.0 L diesel engine.

j. "Ford has experienced unprecedented repair rates with the 6.0 L engines. The 6.0 L has had the largest R/1000 (repairs per thousand) rate ever experienced by Ford for an engine in widespread distribution. In fact, the 6.0 L, which represents only 10% of Ford's total engine volume, accounts for approximately 80% of all Ford's warranty spending on engines. Additionally, warranty spending on the 6.0 L accounts for approximately 25% of Ford's overall warranty spending."

k. "Ford and Navistar participated in more than 100 joint projects that focused on identifying and resolving specific issues with the 6.0 L engine parts. For many of the engine parts, Ford, Navistar, and/or Navistar suppliers, have identified specific design and manufacturing issues that are Navistar's responsibility and that have caused the parts to fail."

5

7.   Defendant Navistar, Inc. ("Navistar") is a Delaware corporation, having its principal place of business at 4201 Winfield Road in in Warrenville, Illinois.  Upon information and belief, the corporate entity formerly known as International Truck and Engine Corporation is currently known as Navistar, Inc.   Pursuant to a contractual agreement between Ford and International Truck and Engine Corporation, Navistar is the sole supplier of diesel engines used in approximately 275,000 Ford diesel pick up trucks annually.  As detailed herein, as a result of Navistar's defective design and manufacture the 6.0 L diesel engine, consumers like Plaintiff and the members of the class he seeks to represent have been saddled with defective and unmerchantable engines, and have been forced to incur significant repair and associated expenses.  So pervasive were the problems with the design and manufacture of the 6.0 L diesel engine, that on or about January 11, 2007 Ford filed suit against Navistar, alleging, *inter alia*, that Navistar had failed to shoulder its responsibility for paying the enormous warranty costs Ford incurred as a result of the unprecedented problems and quality issues plaguing the 6.0 L diesel engine.  In that lawsuit, Navistar did not deny that quality issues existed with respect to the 6.0 L diesel engine that it had designed and manufactured for Ford, but rather placed the blame on Ford for, *inter alia*, not adequately training its personnel to diagnose, repair, and service the engine, and for not equipping its dealers with the appropriate tools to do so.  Specifically, Navistar's filings in the lawsuit brought by Ford represented, *inter alia*, that:

a.       "Ford delayed by one year the training of <u>any</u> mechanics in repairing Counter-Plaintiffs' [Navistar's] 6.0 L diesel engine."

b.       "Dealers have specifically complained to Ford that they did not have sufficient training on diagnosing and repairing the 6.0 L engine manufactured by Counter-Plaintiffs [Navistar]."

c.       "Ford also failed to provide its dealers with the proper tools to provide the needed repairs and to have certified diesel technicians do the work."

6

## DEFENDANTS' OMISSIONS, FAILURE TO DISCLOSE, AND AFFIRMATIVE MISREPRESENTATIONS CONCERNING THE 6.0 L DIESEL ENGINE AND THE FORD VEHICLES IT POWERED

8.      As the foregoing allegations demonstrate, both Ford and Navistar knew from the outset that there were severe and pervasive design, manufacturing, and quality issues plaguing the Ford 6.0 L diesel engine powering Ford's trucks. Yet, despite this knowledge, neither Defendant disclosed any of these issues to consumers.

9.      To the contrary, at the same time that Ford and Navistar were internally battling over the quality issues and defects plaguing the Ford 6.0 L diesel engine, Ford was making the precise *opposite* representations to consumers as to the quality of the engine and the vehicles it powered. For example, in its online 2004 marketing campaign, Ford published a website then-found online at www.powerstrokediesel.com, specifically to tout the supposed superior attributes of the Power Stroke diesel engine. A copy of portions of that website as published on January 2004, is attached hereto as Exhibit 1 to this Complaint. While internally Ford recognized the unprecedented, widespread problems plaguing the 6.0 L Power Stroke® diesel engine, on its website, at the same time, Ford represented instead that:

> a.  "Power Stroke Diesels are designed to keep these 'Built Ford Tough' trucks on the road and in business for a long, long time." (Ex. 1 at 1);
>
> b.  "In 2002, the all-new 6.0 liter Power Stroke Diesel engine introduced the next diesel era, and Ford's super-duty trucks took another quantum leap ahead of the competition." (Ex. 1 at 2).

10.     The website launched by Ford specifically to advertise the supposed merits of the Power Stroke diesel engine was just one discrete piece of a widespread and pervasive advertising campaign that Ford implemented to provide consumers, like Plaintiff and the members of the putative class, with the impression that Ford trucks equipped with the 6.0 L diesel engine were of superior quality, reliability and durability, when, in fact, Ford knew that

7

the precise opposite was true. For example, in Ford's sales brochure for the 2005 Ford F-250 and F-350 trucks, which is attached hereto as Exhibit 2, Ford touted to consumers that:

a. The 2005 Ford F-250 and Ford F-350 trucks had the "Best Power," explicitly referencing the "6.0 L 32 Valve Power Stroke® V8 Turbo Diesel"

b. The Ford F-250 and F-350 were equipped with a "Best in Class" "Longestlasting Diesel Engine"

c. "Longest-Lasting Diesel: Cast-Iron Block Head- This proven architecture withstands the higher combustion pressure of peak diesel operation. The stiff bedplate provides rigidity. Electro-Hydraulic Direct Injection (EDHI), 4-valve induction, and electronic engine control promote efficient combustion for optimized horsepower and torque. All-together the 6.0L Power Stroke® is the longest-lasting diesel in its class."

d. "Power Stroke V8 Turbo Diesel – F-Series Super Duty outpulls the competition from a dead stop, in a 0-60 mph tow off. It's done through careful powertrain management from engine to gearing to wheels and tire. The result is more-capable trucks.

e. Throughout the brochure, as in all Ford marketing materials about the subject trucks, Ford highlighted as its advertising slogan and sales pitch that the trucks were "Built Ford Tough."

11. The attached website pages and sales brochure are just two of the many advertisements and representations that Ford disseminated about the Ford F-Super Duty truck series that were equipped with the 6.0 L Power Stroke diesel engine and that conveyed the message that the 6.0 L diesel engine was of superior design, quality, reliability, and durability. Despite knowing that the engines powering these trucks were plagued with what Ford internally described as "unprecedented problems," Ford orchestrated and implemented a widespread advertising and marketing campaign to convince consumers that the precise opposite was true; namely, that the engines and vehicles were of superior quality, design, manufacture, and reliability. In this regard, Mark Fields, Ford's then President of the Americas, publicly

8

proclaimed that the Navistar 6.0 L Power Stroke diesel engine—the very same engine whose design and quality issues would lead Ford to sue Navistar—was a "great engine." Despite its knowledge of the Power Stroke® 6.0 L diesel engine's many flaws and quality concerns, Ford trained its dealers throughout the country to specifically tout the supposedly superior attributes of the engine, without ever mentioning its troubled history of design, manufacturing, and reliability defects.

12. Not only did Ford omit any mention to consumers about the significant design, manufacture, and quality concerns it had identified with the Power Stroke® diesel engine, but at the same time, Ford also failed to inform consumers that Ford, itself, had failed to adequately train or equip its dealers and their repair technicians to service, diagnose, or repair the engines. Nor did Ford inform consumers that Ford had failed to timely provide to dealers and their repair technicians with the necessary tools required to repair and work on the engines.

## THE CONTRACTUAL RELATIONSHIP BETWEEN CO-DEFENDANTS LEADING TO THE DESIGN AND MANUFACTURE OF THE ILL-FATED 6.0 L DIESEL ENGINE

13. On October 1997, Navistar and Ford entered into a contractual agreement, commonly known as "Next Generation Diesel Engine Supply Agreement Job #1, 2003 Model Year Through Job Last 2012 Model Year" ("the Agreement")" a copy of which is attached hereto as Exhibit 3 to this Complaint, pursuant to which Navistar agreed to supply Ford with all its requirements for diesel truck engines in North America for model years 2003 through 2012. The Agreement was subject to a series of amendments or modifications over time, including a first set of amendments entered into by Ford and Navistar on or about April 11, 2003, as well as a second set of amendments entered into by Ford and Navistar on or about November 6, 2004.

14. Under the Agreement, Navistar was to "design, develop, manufacture, and supply

100 percent of Buyer's [Ford's] requirements for the US and Canada for the Next Generation Diesel II (NGDII) Engine for the 8500 lbs and over GVWR vehicles, as described and defined by the matrix of functional requirements attached as Exhibit A [to the Agreement]." (Ex. 3: Agreement, at ¶ 1.A).

15.     Under the Agreement, Ford was to bear the costs of and administer the training program for Ford technicians to diagnose, repair, and service the engines.  (Ex. 3: Agreement, at ¶ 22.B.2.c).

16.     The Agreement to design, manufacture, and supply of diesel engines was undertaken for the benefit of purchasers and lessees of Ford vehicles that were to be equipped with this new engine, as it was the owners and lessees of Ford vehicles that were to make use and were to benefit from the engine.  Ford, of course, did not purchase the diesel engines for its own use, but rather, from the outset, it was the parties' understanding, agreement, and intent, that the engines were to be supplied by Navistar to Ford for the ultimate benefit of Ford owners and lessees, like Plaintiff and the members of the putative class.

## PRIOR AND CURRENT CLASS ACTIONS REGARDING THE POWER STROKE® DIESEL ENGINE

17.     This class action is not the first one to allege claims related to the pervasive defects and quality issues found in the Ford Power Stroke® diesel engine.  Ford has previously entered into a nationwide class action settlement in *Williams A. Ambulance, Inc. v. Ford Motor Company*, No. 06-cv-776-MAC (E.D. Tex.) that became final last year.  That class action settlement was reached on behalf of a class of owners or lessees of model year 2003-2007 ambulances equipped with Ford's 6.0 L diesel engine, who complained of pervasive defects and quality issues with the Ford engine.

18.     As part of the class action settlement in *Williams A. Ambulance*, *Inc.*, the United States District Court for the Eastern District of Texas, with Ford's consent or non-opposition, certified a nationwide class of owners and lessees of model year 2003-2007 ambulances within the United States equipped with ambulance prep package 47A and and with Ford's 6.0 L diesel engine.  Under the terms of that settlement agreement, Ford agreed to, *inter alia*:  extend the coverage of certain aspects of its express warranty for the vehicles and/or specific engine components thereof; implement a claims procedure by which qualified claimants could seek reimbursement for their prior repair expenses for repairs previously undertaken that involved components of the 6.0 L diesel engine; cover 50% of the cost of an engine replacement where such an engine replacement was needed, under certain circumstances; cover certain qualifying towing expenses incurred by the members of the settlement class; reimburse, under certain circumstances, the warranty deductibles that qualifying class members paid as part of obtaining repair services for components of the 6.0 L diesel engine covered by the settlement; provide, at a class member's request, a specific host of options to enhance the maintenance of the vehicles covered by the settlement; and, to pay the class members' attorneys' fees and costs awarded by the district court, subject to the terms set forth in the settlement agreement.

19.     The settlement agreement entered into by Ford in *Williams A. Ambulance, Inc.*, purported to resolve the claims of owners and lessees only of ambulances equipped with the Ford 6.0 L diesel engines.  That suit and that settlement did nothing to address the claims of non-ambulance owners, who form part of the putative class alleged in this complaint.

20.     In addition to this Class Action Complaint, filed before this Court by Plaintiff Forrest Pace, Plaintiff is also informed and believes that a number of other class action complaints have or are currently being filed in federal district courts across the country against

Ford and/or Navistar, alleging similar claims under various state laws for alleged defects in the 6.0 L diesel engine powering Ford's trucks.

## CLASS ACTION ALLEGATIONS

21.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action as a class action on behalf of all owners and lessees within North Carolina of Ford vehicles equipped with Navistar's 6.0 L diesel engine, commonly referred to as the Power Stroke® V8 Turbo diesel engine.  Specifically excluded from the class definition are all owners or lessees of such vehicles that are ambulances equipped with the 47A ambulance package (and hence would have been part of the *Williams A. Ambulance, Inc.* class definition).  Also excluded from the class are all judicial officers presiding over this or any related case, as well as all local, state and federal government employees.  The class definition also excludes all employees of Defendants or of their corporate affiliates. Plaintiff reserves the right to modify this class definition as discovery or other case circumstances warrant.

22.     Although the exact number of class members is presently unknown, Plaintiff is informed and believes and thereon alleges that the class will number at least in the tens or hundreds of thousands of consumers, thereby making joinder impracticable.  Navistar and Ford have each previously represented that the 6.0 L diesel engine was found in approximately 275,000 Ford trucks annually.  Even if a fraction of such vehicles are found in North Carolina, the class definition still readily satisfies the numerosity requirement for class certification.

23.     Class certification is also appropriate because there are questions of fact and/or law that are common to the class members.  Among these common questions of fact and/or law are:

    a.   Whether the Navistar 6.0 L diesel engine is defective;

b. Whether Navistar and/or Ford negligently performed their respective contractual duties to manufacture and design the subject engine and to train technicians to repair, diagnose, and service the engine;

c. Whether Defendants engaged in violations of the North Carolina Unfair and Deceptive Trade Practices Act with respect to the 6.0 L diesel engine;

d. Whether Ford breached its warranties pertaining to the 6.0 L diesel engine;

e. Whether Plaintiff and the members of the putative class are intended third-party beneficiaries of the Agreement between Navistar and Ford;

f. Whether Navistar materially breached its contractual duties that were to run to and be performed for the benefit of Plaintiff and the putative class members;

g. Whether class members are entitled to the relief sought, and if so, the proper scope of such relief.

h. Whether Defendants' conduct gives rise to punitive damages.

24.     Plaintiff's claims are typical of the claims of the absent class members in that Plaintiff, like all the absent class members, claims that he is the owner or lessee of a Ford vehicle within North Carolina that is equipped with the 6.0 L diesel engine that is defective, and whose defects were not disclosed, and attributes were misrepresented by Defendants. Plaintiff is a member of the class he seeks to represent, and the claims he advances on his own behalf are identical to the claims asserted on behalf of the class.

25.     Plaintiff is an adequate class representative in that, as a member of the class and as a current owner of an allegedly defective Ford vehicle equipped with the 6.0 L diesel engine, his interests are entirely aligned with those of the class. There are no individual conflicts that prevent Plaintiff from adequately representing the class. Plaintiff has also retained competent

counsel experienced in class action litigation.

26.     Class certification is proper because common questions of fact and law predominate over questions that may affect only individual members of the class. The subject vehicles are manufactured on an assembly line setting, and this case involves a single engine designation—the Ford/Navistar 6.0L diesel engine, that is subject to a common design and manufacturing plan, such that evidence of a defect in the design or manufacture of the engine would be one that would predominate over the entire class membership, as would evidence of Defendants' course of action, knowledge of the alleged defect, and any alleged concealment or misrepresentation thereof.

27.     A class action presents a superior form of adjudication over individual litigation. The costs of litigating this action against large and sophisticated entities like Defendants in comparison to the recovery or relief sought would make individual litigation impracticable.  In addition, forcing individual litigation would risk the result of inconsistent rulings with respect to Defendants' duties owed to the various vehicle owners and lessees.

28.      A class action is manageable.  The proposed class represents an identifiable community that can be readily identified, and the relief sought is one that can be overseen by the Court.

## COUNT I

## (AGAINST ALL DEFENDANTS)

## (VIOLATION OF NORTH CAROLINA DECEPTIVE TRADE PRACTICES ACT, N.C.G.S.A.  § 75-1.1)

29.     Plaintiff hereby incorporates by reference every allegation of this Complaint with the same force and effect as if it had been fully restated herein.

14

30.     Defendants Navistar and Ford, through the conduct alleged herein, have engaged in unfair and/or deceptive acts and/or practices, within the meaning of N.C.G.S.A., § 75-1.1. Defendants' unfair and/or deceptive trade practices were in or affecting commerce.  Defendants' unfair and/or deceptive acts were done knowingly and willfully.

31.     Plaintiff and members of the class he seeks to represent reasonably relied upon the representations, omissions, and advertisements made by Ford in connection with the qualities, standards, characteristics, and/or attributes of the Ford vehicles equipped with the 6.0 L diesel engine.

32.     Defendants' violations of the North Carolina Unfair and Deceptive Trade Practices Act have injured and damaged Plaintiff and the members of the Class he seeks to represent by leaving them with trucks that are defective, of diminished value, and causing Plaintiff and members of the class he seeks to represent to have spent significant out-of-pocket monies in repairs and associated expenses.

33.     As a direct and proximate result of Defendants' violations of law, Plaintiff and the Class are entitled to monetary damages, including treble damages under N.C.G.S.A., § 75-16, as well as equitable, declaratory, and injunctive relief.

34.     Plaintiff is also entitled to and hereby seeks an order directing Defendants to pay Plaintiff's reasonable attorneys' fees and costs of suit, as awarded by the Court, pursuant to N.C.G.S.A., § 75-16.1

<u>**COUNT II**</u>

**(AGAINST DEFENDANT FORD MOTOR COMPANY ONLY)**

**(VIOLATION OF EXPRESS WARRANTY)**

35.     Plaintiff hereby incorporates by reference every allegation of this Complaint with

the same force and effect as if it had been fully restated herein.

36. As alleged herein, Defendant Ford issued a written warranty for each Ford vehicle equipped with the 6.0 L diesel engine. The warranty warranted against any defects in the engine, and offered repair and replacement for the same. The warranty was unilaterally drafted by Ford without input from Plaintiff or any of the class members, and was offered on a "take it or leave it" basis by Ford, who, as one of the world's largest automobiles manufacturers with superior knowledge as to the workings of automobiles and engines, had a disparately superior bargaining power with respect to the terms of the warranty coverage applicable to class members' vehicles.

37. Although Ford purported to introduce a limitation in the warranty, setting a durational limit corresponding to the first of 5 years or 100,000 miles for the warranty coverage, because Ford: already knew that the vehicles and their engines were defective and unmerchantable at the time of sale, failed to disclose this to unsuspecting consumers, and affirmatively made misrepresentations to the contrary, it would be unconscionable to honor and recognize Ford's attempted imposition of the 5 year/100,000 mile durational limit into its warranty offering. Due to the unconscionability of Ford's unilateral imposition of this durational limit when it knew but concealed and misrepresented the presence of the defects in class members' vehicles, Ford's reliance on that durational limit to refuse to honor payment for repairs or replacements required as a direct and foreseeable result of the very defects known to Ford at the time of sale is unenforceable.

38. Ford's failure to repair and/or replace the defective 6.0 L engines beyond this 5 year/100,000 mile unconscionable durational limit, therefore, amounts to a material breach of its express warranty.

39. As a direct, foreseeable, and proximate result of Ford's material breach of its

16

express warranty, Plaintiff and the members of the class he seeks to represent have been injured by being denied repair and/or replacement coverage under the warranty, as they were entitled to receive, and by being forced to pay for such repair and replacement work that was brought about by Defendants' conduct and the defective engines in class members' vehicles.

40.     Plaintiff and the members of the class he seeks to represent are entitled to and do seek declaratory relief, declaring that Ford's attempted imposition of the 5 year/100,000 mile durational limit on its warranty coverage for the 6.0 L diesel engine is unconscionable and unenforceable, such that Plaintiff and class members have a right under the express warranty to have Ford pay for the cost of repair and/or replacement of the defective engines without regard to this unconscionable durational limit unilaterally imposed by Ford.  Plaintiff and the class members also seek injunctive relief to enjoin Ford from refusing to honor its obligations to repair and/or replace the defective engine components on the basis that the 5 year or 100,000 mile purported durational limit of the express warranty has lapsed.   Plaintiff and the class members also seek monetary relief to compensate them for their actual out-of-pocket expenses they incurred in having to pay for the repair and/or replacement of the defective engines, when such costs should have been borne by Ford under the express warranty.

## COUNT III

## (AGAINST ALL DEFENDANTS)

## (NEGLIGENCE)

41.     Plaintiff hereby incorporates by reference each and every allegation of this Complaint with the same force and effect as if it had been fully restated herein.

42.     Defendants owed Plaintiff and the class members a duty of reasonable care with respect to the design, manufacture, and distribution of the 6.0 L Power Stroke® diesel engine that

was incorporated into Ford trucks. The duty to design, manufacture, and distribute a safe motor

vehicle arises, *inter alia*, by terms of the Federal Motor Vehicle Safety Act, 49 U.S.C. § 30101

43.     Defendants breached that duty.

44.     As a proximate and foreseeable result of this breach and Defendants' negligence,

Plaintiff and the members of the class have been injured by being forced to operate an inherently

dangerous vehicle, and being forced to expend significant money in repairs and associated

expenses like towing, rental cars, and loss of use of the vehicle, as well as by being forced to

incur a loss of worth or value of their vehicles that is directly attributable to Defendants'

negligence.

45.     Plaintiff and the members of the putative class are entitled and seek to recover

consequential, incidental, and punitive damages foreseeable and directly caused by the defective

engine and vehicles.

**COUNT IV**

**(AGAINST DEFENDANT NAVISTAR ONLY)**

**(BREACH OF CONTRACTUAL DUTIES TO THIRD-PARTY BENEFICIARIES)**

46.     Plaintiff hereby incorporates by reference every allegation of this Complaint with

the same force and effect as if it had been fully restated herein.

47.     The Agreement entered into by Ford and Navistar (formerly International Truck

and Engine Corporation) by which Navistar was to design, manufacture, and supply a new

generation of diesel engines to power Ford trucks that were to be sold to consumers contained

promises and obligations that the contracting parties intended to benefit Plaintiff and members of

the putative class as ultimate purchasers, lessees, and operators of the vehicles that were to be

equipped with this engine.

48.    Plaintiff and the members of the putative class are intended third-party beneficiaries of the Agreement, whose rights under the Agreement have vested and, therefore, have standing to sue for breach of those contractual obligations and promises whose benefit was intended to run to them.

49.    Defendant Navistar materially breached its contractual obligation under the Agreement, and specifically, materially breached the contractual obligations that were intended to benefit Plaintiff and the class members.  Navistar engaged in this material breach by failing to properly design and manufacture the 6.0 L diesel engine, and instead defectively designed and/or manufactured the engine, causing Plaintiff and the putative class members to sustain harm by, *inter alia*, leaving them with a defective truck, forcing them to incur and pay expenses for repair and replacement of the defective engine or its components, and causing them to incur a diminution in value of their vehicles caused by the defective nature of the engine.

50.    Plaintiff and the members of the putative class are entitled and seek to recover consequential and incidental damages for Navistar's material breach of the Agreement.


## COUNT V

### (AGAINST ALL DEFENDANTS)

### (UNJUST ENRICHMENT)

51.    Plaintiff hereby incorporates by reference every allegation of this Complaint with the same force and effect as if it had been fully restated herein.

52.    Plaintiff and the Class members all conferred a benefit on Defendants in the form of moneys paid for Ford trucks equipped with the Navistar–designed and manufactured 6.0 L diesel engines, as well as in the form of repair and parts bills to Defendants for repairs and

servicing to the vehicle engines.

53.     Defendants appreciated these benefits conveyed upon them by Plaintiff and the Class members, as Defendants, *inter alia*, reported them as revenues in their financial disclosures and reports to investors.

54.     In light of Defendants' failures relating to the design, manufacture, repair, marketing and sale of the subject engines in the Ford vehicles, it would be inequitable to permit Defendants to keep these benefits, as they would unjustly enrich Defendants at the expense of Plaintiff and the members of the Class.

55.     Plaintiff and the Class members are therefore entitled to and do hereby seek an order directing Defendants to disgorge their ill-gotten gains conveyed upon them by Plaintiff and the Class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class members pray for the following:

a) That the Court determine that this action may be litigated as a class action, and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b) That the Court enter judgment against Defendants and in favor of Plaintiffs, the class on all counts;

c) That Defendants be required by this Court's Order to create a common fund to remedy the defects alleged herein, and to compensate all members of the class for their damages and injuries, including statutory treble damages where permitted by law, as well as to compensate Plaintiff's counsel for their attorneys' fees and cost of suit; and, that Defendants be ordered to bear the cost of notice the absent class members, as well as of the administration of this common fund;

d) That damages and/or restitution or disgorgement be awarded to each Plaintiff and class member according to proof;

e) That the Court award Plaintiffs and the members of the class punitive damages assessed against Defendants;

f) That the Court find that Defendants' violation of the North Carolina Unfair and Deceptive Trade Practices Act was knowing and willful, and therefore award Plaintiff's counsel an award of attorneys' fees and cost or expenses of suit;

g) That Plaintiff and the class members be awarded all such other relief as this Court deems just and proper.

Plaintiffs request a jury trial on all counts so triable.

21

Dated this 6th day of December, 2010.

Respectfully submitted,

/s/ Rebecca Cameron Blount
Rebecca Cameron Blount
NC State Bar No.: 27718
BLOUNT & BLOUNT, P.C.
1420 E. Arlington Blvd. Ste. A
Greenville, NC 27858
Telephone: (252) 752-6000
Facsimile: (252) 752-2174
Email: rebecca@blountlegal.com


Roy A. Katriel (*pro hac vice* application to be filed)
THE KATRIEL LAW FIRM
12707 High Bluff Dr., Suite 200
San Diego, CA 92130
Telephone: (858) 350-4342
Facsimile:  (858) 304-5505
e-mail: rak@katriellaw.com

*Counsel for Plaintiff*